UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
----------------------------------------------------------------------X

ANDREW BROOKS,

                        Plaintiff,                          Civ. Action No.:

          vs.                                               **COMPLAINT**

                                                            **JURY TRIAL DEMANDED**

TEACH FOR AMERICA, INC. AND DELAWARE
COLLEGE PREPARATORY ACADEMY, INC.,

                        Defendants.

----------------------------------------------------------------------X

          ANDREW BROOKS, Plaintiff *Pro Se* ("Plaintiff" or "Brooks"), files this complaint and

alleges and complains as follows:

## NATURE OF THIS ACTION

1.     Plaintiff brings this action for employment discrimination, hostile work environment and

retaliation based on disability, sex/gender stereotyping and race against defendants, TEACH

FOR AMERICA, INC. ('TFA") and DELAWARE COLLEGE PREPARATORY ACADEMY,

INC. ("DCPA") to remedy suffered harms and seek damages for said defendants' unlawful

employment practices resulting in violation of his constitutional, statutory and civil rights under

one or more of (a) the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101 *et seq.* as

amended (the "ADA"), (b) the ADA Amendments Act of 2008, as amended (the "ADAAA"), (c)

the Rehabilitation Act of 1973, 29 U.S.C. §§701, *et seq.*, as amended, ("RA"), (d)  TITLE VII of

the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, as amended ("TITLE VII"); (e) the

Civil Rights Act of 1991, as amended ("CRA 1991"), (e) the State of Delaware's Discrimination

In Employment Act, Delaware Code, Labor Law Title 19, Subchapter §§710 *et seq.*, as amended

(the "DE-DEA"), and (f) the State of Delaware's Persons With Disabilities Employment Protections Act, Delaware Code, Labor Law Title 19, Subchapter, §§720 *et seq.*, as amended, and as the successor act to Delaware Code Labor Law known as Handicapped Persons Employment Protections Act (collectively, the "DE-PDEPA"). The undersigned Plaintiff seeks this court's relief and award of damages against said defendants as a jury shall find just and proper including for lost earnings and financial harm, lost value of employee benefits, lost value of TFA subsidized interest on college loans and other loan forgiveness by loss of his TFA status, lost value of his second year Segal AmeriCorps Education Award, teaching career opportunities, lost prestigious opportunity to attain his master's degree at University of Pennsylvania, under or by reason of the terms, benefits and privileges of his TFA assigned teacher with DCPA and TFA 2010 Corps Member status, suspension and loss of his "Highly Qualified" teacher licensure status and TFA alternative teacher certification, lost employment, compensatory damages, punitive and exemplary damages, emotional distress damages, and such further appropriate relief as shall be granted in this action under the ADA, ADAAA, RA, TITLE VII, CRA 1991, DE-DEA and DE-PDEPA.

## THE PARTIES

2.      Plaintiff is a former TFA 2010 Corps Member teacher who was assigned at TFA's direction and placed by TFA to perform his teaching services at and under the common direction, control, and supervision of defendants TFA and DCPA. He formerly resided in Wilmington, Delaware during the term of his employment with defendants. He presently resides in the County of Fairfield, Town of New Canaan, State of Connecticut. He is a citizen of the United States.

3.      Upon information and belief, defendant TFA was organized and formed as a not-for-profit corporation under the laws of the State of Connecticut. Upon further information and

2

belief, TFA maintains regional offices in the United States and renders its services and conducts business in the city of Wilmington, County of New Castle, State of Delaware as a foreign not-for-profit corporation. TFA's local Wilmington staff is believed to consist of an executive (regional) director, one or more program directors and managers, training and administrative staff and/or persons having an employment relationship with TFA including an estimated 40+ TFA Corps Member teachers in Delaware (and thousands more across the nation). According to its website and press releases, TFA engages in teacher recruiting, placement, training, and mentoring. TFA wore three hats during Plaintiff's teaching at DCPA as "employer", "placement agency" and "training organization". Unlike a traditional placement agency or training organization, TFA retained significant employment control, direction and influence over Plaintiff's performance under his TFA RPP Commitment (as later defined herein) and employment (including decision-making in regard to his hiring, discharge of duties, classroom achievement outcomes, work product and dismissal).

4.      Upon information and belief, defendant DCPA was and is organized as a not-for-profit corporation under Delaware law and operates a state-authorized public charter elementary school situated in the Red Clay Consolidated School District ("Red Clay") in the city of Wilmington, County of New Castle, State of Delaware. According to defendant DCPA's website, it had and continues to have a school board, an appointed executive director, school administrators and a staff of teachers. During TFA's assignment of Plaintiff to fill a 2010 Corps Member teaching slot at its partner school, DCPA, he taught a primarily African American urban student population including students identified for special education support/services under education plans governed by the RA's Rule 504 and/or individualized education plans governed by the Individuals With Disabilities Education Act, as amended ("IDEA") and/or other applicable

3

statutory framework. Upon further information and belief, DCPA received and may continue to be receiving government funding for special education support/services administered through the Delaware Department of Education ("DE-DOE") and state comptroller or other government agencies. During Plaintiff's employment, he observed that DCPA provided government subsidized free meal programs for students.

5.      Upon information and belief, TFA received and continues to receive fees in payment for each TFA Corps Member teacher placed in one of its TFA partner schools in Delaware school districts including Red Clay. During Plaintiff's employment, TFA was believed to be engaging in a myriad of teacher vetting, recruiting, placement, oversight of TFA's alternative teacher licensing program, teacher support and professional development training, and other related TFA services under its expansive written agreement with the DE-DOE or similarly purposed TFA partner school agreements nationally with charter schools like DCPA.

6.      Upon information and belief, TFA and DCPA are covered persons and entities subject to compliance with the ADA, ADAAA, RA, TITLE VII, CRA 1991, and also the state DE-DEA and DE-PDEPA among other applicable federal, state or local laws. As each of the defendants are believed to be recipients of government funds and public grants, defendants are held to strict compliance with laws governing access to a free and appropriate public education, to equal employment opportunities, training programs, and public accommodations.

7.      Plaintiff reserves his right(s) to add necessary party-defendants who aided and abetted the unlawful discriminatory employment practices against him as prohibited by the Delaware's DEA and PDEP culminating in the loss of Plaintiff's employment and desirable TFA 2010 Corps Member teacher status and TFA Alumni status and constituting discrimination, hostile work environment and retaliation complained of herein.

4

## JURISDICTION AND VENUE

8.  This court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331, 1343. This court has supplemental jurisdiction over Plaintiff's state law claims as authorized by 28 U.S.C. § 1367(a).

9.  Venue properly lies within this judicial district as defendant TFA maintains an office in the city of Wilmington for the conduct of its business. Defendant DCPA operates a charter school in the city of Wilmington and the situs of Plaintiff's rendered teaching services and the employment discrimination complained of substantially occurred in this judicial district.

10.  Plaintiff has fulfilled the prerequisites for exhaustion of his federal and state administrative remedies prior to filing this complaint. Attached hereto are true copies of each notice of dismissal and "right-to-sue" (Exhibit "A") respectively issued to him by the U.S. Equal Employment Opportunity Commission and Delaware's Department of Labor, Office of Anti-Discrimination, where Plaintiff's dual filing of said state and federal agency charges were submitted on November 10, 2011 against TFA and DCPA.

## STATEMENT OF FACTS

11.  Plaintiff is a 2009 college graduate of Brandeis University and holds a Bachelor's Degree in Economics and History with a minor in International and Global Studies. As alleged herein, he is a former TFA 2010 Corps Member teacher and taught second grade at a TFA partner charter school (defendant DCPA) in Wilmington, DE from August 8, 2010 through the end of the academic year on June 30, 2011. He was paid a salary of $35,000.00 for which he was required to work a 9-hour school day. DCPA required the teachers to serve breakfast and lunch (and snacks) to their assigned classroom of students. Plaintiff was not provided teacher meal

breaks or *daily* lesson planning periods during the school day in contrast to TFA Corps Member teachers assigned to teach at traditional public schools in Red Clay.

12.     Being a TFA 2010 Corps Member teacher with self-identified disabilities, Plaintiff made sure that each of the defendants was made aware of the nature of his impairments during the recruiting, selection, training and hiring process. Due to his documented disabilities of Attention Deficit Disorder, ("ADD") Learning Disabilities ("LD") and speech impediment (stammering), Plaintiff ultimately faced a tougher road than most of his TFA colleagues to meet the defendants' demands of his teaching position. In the case of his speech impairment (stammering), the nature of his disability was obvious.

13.     While matriculating at Brandeis University, and between grades 2 through 12, he received disabilities accommodations principally for time management challenges, testing times, and for time-oriented tasks involving complex reading and writing.

14.     In June 2011 (near the end of the 2010 academic year), Plaintiff was delighted to receive the *highest possible rating* of "Effective" in the DE-DOE's mandatory annual state teaching appraisal (the "Summative Evaluation") while achieving the highest possible rating in all five (5) teaching component areas: (a) planning and preparation, (b) classroom environment, (c) instruction, (d) professional responsibilities and (e) student improvement following two DE-DOE mandatory "Formative Feedbacks" (classroom observations of a "novice teacher").

15.     DCPA's then Dean of Instruction, Astrid Bono, a credentialed teaching professional with well over 10 years of experience was Plaintiff's appointed evaluator. Bono shared the positive results of the Summative Evaluation with Plaintiff in June 2011 in the form of a "performance discussion." Upon information and belief, DCPA's then Executive Director, Anita Roberson ("Roberson"), an African-American female, had no comparable (or any) state-issued

teaching and administrative licenses or credentials, and had little to no classroom teaching experience. Yet, she subjected Plaintiff to a second "performance discussion" on July 12, 2011 after the school year had ended, that lasted 6+ hours and in which she refused to engage in dialogue about his disclosed disabilities and became enraged, accusing him of playing the "disability card."

16.     This unscheduled post-academic year "performance discussion" in July was held in spite of the fact that the Plaintiff had just been evaluated in June and rated "Effective." In addition, by virtue of such a discussion occurring after the end of the school year, it was in violation of the Plaintiff's teacher contract. Further, Plaintiff did not receive Roberson's performance rubric ("Roberson's Rubric") as the other teachers did in advance of this second "performance discussion." Roberson's Rubric was designed for internal use at DCPA, as opposed to the state's official evaluation guidelines and objective criteria.

17.     Both Roberson and TFA's Delaware Executive Director, Joseph Moorman ("Moorman"), who assumed his role in late April 2011, played down the reliability and significance of Plaintiff's earned ratings based on the DE-DOE's state mandatory teacher appraisal system (in June 2011) judging him to be "Effective" based on its stringent evaluation standards and objective criteria in five teacher performance areas including classroom management.

18.     During Roberson's arbitrary post-academic performance discussion, she repeatedly accorded little credence to Plaintiff's highest scoring in his state performance appraisal and classroom observation ratings. In addition, his positive student data achievement outcomes were ignored.

7

19.    TFA and DCPA operated together in tandem in the supervision of TFA teachers including hiring and dismissal. In the case of the Plaintiff, the defendants consorted to scrutinize, ridicule, inflate the severity of and falsely distort circumstances without affording him an ongoing interactive process to confer about his impairments.

20.    TFA and DCPA made no effort to fairly assess his classroom management skills as a novice teacher with disabilities and especially the impact of his speech impediment (stammer) in the classroom. Instead, he was perceived as not being a "leader" or "manning up" or having a "male voice" in the classroom as hereinafter alleged.

21.    Around the time of Plaintiff's positive Summative Evaluation, TFA directed him to sign the TFA 2010 Corps Member teacher commitment for the *second year* of teaching (the "TFA second RPP Commitment") which he did on June 8, 2011.

22.    At the end of June, Plaintiff participated in TFA's customary "end-of-year conversation" after DCPA classes ended (on or about June 26). He informed the *new* TFA Delaware Executive Director (Moorman) and TFA Program Director Morgan Lock ("Lock") about his continuing progress and positive student achievement outcomes to help "close the achievement gap" in Wilmington's inner city schools. Plaintiff's meeting with Moorman and Lock ended positively without suggestion that his TFA status was in jeopardy.

23.    Lock's prior email(s) to set up these "end-of–year conversations" had been circulated in May to Delaware's TFA Corps Member teachers indicating that *Moorman's attendance was optional*. Since Plaintiff had no expectation of performance discipline or negative outcome at his meeting, he saw this as an opportunity to personally meet the new Delaware TFA Executive Director.

24.     Plaintiff was asked to give his honest feedback about his first year of teaching at DCPA (good or bad). The meeting was very casual. It was Plaintiff's first chance to speak personally with Moorman. Moorman never observed Plaintiff in the classroom whereas Lock had observed him several times over the school year.

25.     Subsequent to this end-of-year discussion, Plaintiff confirmed in email to Moorman that he was a teacher with disabilities and that TFA had approved his request for OMIT: extended time (time and one-half) accommodations through TFA's disabilities accommodations office or if Moorman knew that he encountered repeated resistance to be provided extended time by DCPA's Executive Director, OMIT Anita Roberson ("Roberson").

26.     Following the casual year end discussion, Moorman asked the Plaintiff if he planned to remain in Wilmington for the summer. Plaintiff responded that he would be returning home before the July 4th weekend after he finished his remaining student report cards. Moorman stated that he would be in touch with Plaintiff. Plaintiff asked if there was anything to be concerned about, to which Moorman replied "No."

27.     Later that evening, Plaintiff was surprised to receive an email from Moorman, who stated that he wanted to be "transparent" and was considering whether Plaintiff would continue with TFA next year. He said he needed to gather information at the school level (Roberson at DCPA) and would then inform Plaintiff of his decision.

28.     Plaintiff was shocked how or why Moorman would consider dismissing him after their ONE meeting in which he shared his Summative Evaluation's "Effective" rating, his two positive "Formative" classroom observations, and his data demonstrating very positive student achievement outcomes. In addition, TFA had already directed Plaintiff to sign the June 8, 2011

teaching commitment for the ensuing 2011-12 academic year three weeks before. Plaintiff had ended the year successfully so Moorman's email made no sense to him.

29.    While Plaintiff remained in Wilmington as a courtesy to Moorman and waited for Moorman to get back to him, but Moorman headed out of town unbeknownst to him. Plaintiff had emailed Moorman to assure this new Executive Director that if there was some area of his performance that was of concern, there had been no warning or intervention or notice that his continuing TFA status was in jeopardy.

30.    Plaintiff urged that they have a dialogue. He asked to be considered for a TFA improvement plan if Moorman deemed necessary in lieu of dismissal, but reminded Moorman of his "Effective" rating on his Summative Evaluation and included a paragraph in his email about the impact of his impairments and wanted to interact with Moorman directly about his disabilities accommodations (especially if an intervention were to be imposed).

31.    After waiting a few days for a conversation with Moorman, Plaintiff learned that Moorman was still out of town. He was confused by Moorman's hiatus and headed back to Connecticut in the interim. He also re-read his TFA Corps Member Requirements, Policies, and Procedures (the "TFA RPP Commitment or "TFA Commitment"),  and was mystified that Moorman questioned if he was a fit for the ensuing academic year without Moorman first implementing any interventions.

32.    Ultimately, Plaintiff was dismissed by TFA as hereinafter alleged. Notably, on August 4, 2011, *following Moorman's decision to dismiss Plaintiff on grounds of DCPA's non-renewal decision* (as alleged below), TFA sent an "email blast" to all of its Corps Member teachers in the Mid-Atlantic Region stating: "Please keep in mind that dismissal is a last resort after numerous other interventions have failed, and no one should ever be surprised to find him/herself in one of

these situations." The email mentioned several dismissals. Plaintiff was not identified by name but the email referenced his dismissal as due to non-renewal by the assigned TFA partner school.

33. This email blast was extremely humiliating and professionally damaging. Plaintiff was not yet taken off the TFA email distribution list. This email has remained a permanent stain on his reputation to have his TFA dismissal and DCPA's non-renewal published to many Delaware TFA colleagues (and to others he did not know). This email blast emphatically stated that *dismissals were viewed by TFA as a last resort* following multiple interventions. *Plaintiff did not have multiple interventions and even though he requested consideration for school reassignment (like Plaintiff's Latino TFA colleague), he was summarily dismissed by Moorman and denied the informal appeal process (afforded to this colleague).*

34. Lock often videotaped TFA teachers during class. She emailed Plaintiff back on October 14, 2010 that her taping showed his great progress in classroom management in such a short time and how she was thrilled. On or about November 1, 2010, Leslee Bickford, a senior TFA leader, emailed him to say thank you after he volunteered with another TFA 2010 Corps Member teacher (who also worked at DCPA) for a pilot project with Lee Cantor (an outside consultant of TFA). Ms. Bickford had heavily critiqued Plaintiff **once** in September 2010, but Lock's October 14 email applauded him for his videotaped improvements and that she wanted to share his progress with Ms. Bickford. *Plaintiff never heard criticism from Bickford again.*

35. Plaintiff also viewed his personnel file which did not contain records of any disciplinary performance warnings or teaching interventions or negative performance reviews from DCPA. Meanwhile, TFA falsely speaks of a dismissal policy that imposes dismissal as a last resort (after "multiple interventions").

36.     Before the academic year ended, Plaintiff was made aware that one of his TFA 2010 Corps Member Latino colleagues had been summarily dismissed by Moorman (shortly after Moorman became TFA's Delaware Executive Director) and *before* the academic year ended. Upon information and belief, this colleague did not receive an "Effective" rating on his Summative Evaluation and had received notice of his dismissal by his assigned TFA partner school. Plaintiff then learned that, on or about July 1, 2011, TFA had fully reinstated his 2010 Corps Member Latino colleague **via an "informal appeal" process (that was *summarily denied to Plaintiff*).**

37.     Following his end-of-year conversation, Plaintiff eventually learned that his 2010 Corps Member Latino colleague was reassigned to teach at DCPA by Moorman, and Moorman and Roberson slated him (upon information and belief) to fill the 2010 Corps Member second grade teaching slot formerly performed by Plaintiff (consideration for school reassignment was summarily denied to Plaintiff).

38.     When Roberson left for her vacation (on or about June 26), she had given no indication to Plaintiff about not renewing his contract to teach second grade pursuant to his signed TFA *second* year RPP commitment. It was only after Plaintiff sought disabilities accommodations for the upcoming 2011-12 academic year that his TFA standing and teaching opportunity at DCPA were lost.

39.     After Roberson returned from vacation, she set up (post-academic year) performance discussions out of the blue with Plaintiff and the other DCPA teachers. Before Plaintiff left for Delaware (a 3-hour trip) for his evening discussion with Roberson on July 12, 2011, he emailed her that he would be bringing a copy of his professional disabilities evaluation report so they could discuss his need for formal accommodations rather than suffer another year of Roberson's

reproach and brutal reprisals. She replied back via email making false denials that she knew nothing about his disabilities.

40.      The performance discussion became the perfect opportunity for Roberson to berate and intimidate Plaintiff accusing him of "playing the disability card." Similar denigrating remarks about self-identifying his disabilities were echoed by Moorman in a subsequent call to Plaintiff on July 18, 2011 when he informed Plaintiff of his dismissal decision from TFA.

41.      Plaintiff encountered brutal resistance from Roberson whenever he asked for extended time. Instead, she forced him to remain on the school premises past midnight and even forced him to stay overnight at times rather than to afford him extended time accommodations or agree to provide more advance notice of assignments so he could plan ahead.

42.      To this day, Plaintiff has never received DCPA's written notice of non-renewal or a response from DCPA's school board to his written requests for appeal, reconsideration and investigation into the discrimination, hostile work environment and retaliation leading to the adverse decision to not renew him.

43.      He was formally dismissed by TFA via its written notice on July 22, 2011 claiming that the dismissal was due to DCPA's *non-renewal* for a second year of teaching. *However, TFA's reasons began to shift when Plaintiff sought written appeal and explanations from both defendants.*

44.      To this day, TFA has denied Plaintiff its "informal appeal" process following his written communications setting forth the grounds for his opposing its decision to dismiss him in all capacities, and for failing to and refusing to reassign him to a TFA partner (traditional as opposed to charter public) school in Wilmington or in other geographic regions.

45.     His written requests included his objection to being treated unequally compared to his colleague, a TFA 2010 Corps Member Latino teacher (with no known disabilities) who had been fully dismissed by TFA (Moorman) *during the school year* allegedly after this teacher's assigned charter school, upon information and belief, notified TFA that he was being terminated for unsatisfactory performance. A few weeks later, Plaintiff learned that this teacher had been fully reinstated to TFA by Moorman. Plaintiff also later learned (after Plaintiff grieved his non-renewal) that his Latino colleague was reassigned by Moorman to teach at DCPA and assumed Plaintiff's former second grade teaching spot.

46.     Despite that Plaintiff was deemed a "highly qualified" teacher at the DE-DOE website and noted as such on DCPA's webpage at the DOE website, his position was given to Latino colleague. This adverse employment action followed Plaintiff's emails to (a) Moorman and his TFA chain of command appealing his discriminatory disparate treatment (following his "end-of-year" conversation in June) and (b) to Roberson that he was bringing his professional report (concerning his disabilities and recommended accommodations) for their post-academic year performance discussion at DCPA.

47.     Roberson refused to look at the disabilities report and accused Plaintiff of using the "disability card" and playing "victim." She falsely denied that he told her he had disabilities (in great detail during his interview where she took copious notes) or that she knew about his disabilities, and then ridiculed him for seeking disabilities accommodations for the ensuing academic year.

48.     Moorman refused to continue his status as a TFA 2010 Corps Member teacher. He negatively cited Plaintiff for lack of leadership based on feedback he allegedly received from

14

Roberson after she retaliated and decided to not renew him (after Plaintiff dared to bring up the subject of accommodations for the ensuing academic year).

49.     Roberson also launched an attack of Plaintiff's performance even though he had received the highest Summative Evaluation rating of "Effective."

50.     Notably, during the school year, Roberson occasionally stopped by to observe Plaintiff teaching in the classroom. When she did so, she attacked Plaintiff for not having a "male voice" in the classroom and for not "manning up" in his class. She instructed Plaintiff on the one hand to emulate the classroom management style of two black male teachers; however, she also harshly warned him "only black teachers can talk to black students in ways that white teachers can't." She did not clarify further what was meant by her. So, he adjusted the tone and volume of his voice to hopefully sound more "manly" and to "man up."

51.     However, he was harshly criticized by TFA following a single classroom observation in September 2010. His TFA Program Director, Lock, had videotaped him during class shortly thereafter and praised him in an email on October 14, 2010 about his spectacular progress in such a short time. He taught for another 8+ months *without* a repeat "attack" by TFA.

52.     Roberson continued to harass Plaintiff about not being manly enough in her view. She preferred to emasculate, make sexist remarks and deprecatingly engage in male stereotyping. She also summarily refused Plaintiff's informal requests for extended time and instead served him with reprisals and bullying. Her reprisals forced him to stay overnight in the school to finish her assignments by the following morning.  He then was required to teach without sleep, nourishment, shower, change of clothes and stand on his feet for approximately 9 hours during that next school day. These episodes of being bullied and forced to stay at school all night by

15

Roberson (and/or to remain at DCPA past midnight)  continued to be imposed by Roberson in response to his requested extended time.

53.    Unlike traditional public school settings, DCPA did not give him any periods during the school day for class planning or reflection or refocus or for any other daily breaks except once a week on Wednesdays when students were released early from DCPA.  The afternoon time on Wednesdays that was supposed to be used for professional development and lesson planning was not used for those purposes.

54.    DCPA did not furnish a teacher performance rubric at any time during Plaintiff's first academic year of teaching *or a DCPA written job description that identified the essential functions of Plaintiff's position*.  Roberson did not make any good faith effort to engage in an interactive process about disability accommodations.

55.    Similarly, between August 2010 and July 12, 2011, DCPA did not provide an employee handbook or a formal written statement to Plaintiff of its policies governing his employment at DCPA despite the fact that Plaintiff had self-identified his documented disabilities and associated impairments to both defendants.

56.    At the time Plaintiff began his first year of teaching as a novice teacher with self-disclosed disabilities, TFA either knew or should have known that the charter school did not have any protocols in place to address his accommodation needs, such as providing an  employee manual to explain policies covering equal job opportunity, anti-discrimination, anti-harassment and anti-retaliation against teachers including TFA Corps Member teachers. Further, DCPA did not have policy for disabilities accommodations under the ADA, ADAAA, RA (or under Delaware's statutory scheme) or other adopted policies to comply with Delaware's anti-

discrimination Labor Laws prohibiting DCPA's adverse employment actions, decisions and conduct suffered by Plaintiff.

57.     DCPA's state charter (as authorized by Red Clay) mandated the development of a handbook for its teachers, but none was delivered to Plaintiff during his first year of teaching.

58.     Plaintiff appealed his non-renewal and TFA dismissal in five ways alleged below: (a) verbally with Roberson on July 12-13, 2011 and via email on July 18, 2011 after Roberson failed to send the performance rubric from the post-academic year performance discussion as she had promised (Roberson is believed to have been involuntarily terminated by DCPA's school board on or about July 31, 2011); (b) by electronic mail and memoranda to Moorman and to his superior, Jemina Bernard ("Bernard"), an African American female and to TFA's general counsel, Tracy-Elizabeth Clay, Esq. ("Clay"), an African American female; and (c) by electronic mail and formal written notice to DCPA's then interim executive director Kimberly Chambers, an African American female and DCPA school board president, Yardise Jones (Jones), an African American female.    All of the foregoing individuals contributed to defendants' discriminatory conduct, disparate and hostile employment practices and retaliation after Plaintiff engaged in protected activities to oppose the defendants' discriminatory treatment, decisions, behaviors and practices.

59.     However, no corrective measures were taken by defendants to address their unlawful deprivation of Plaintiff's rights with resulting harms. Defendants refused to remedy the inequality of his treatment and/or their complicit and biased employment practices that denied him rights to complete his June 8, 2011 signed TFA *second year* RPP commitment with ever-changing suspect reasons. Further, he was prevented from receiving and enjoying his future

salary, benefits, grants, subsidized interest on his college loans, student loan forgiveness and TFA's prestigious lifetime Alumni status and extremely valuable TFA privileges.

60.        Yet, notably, in his senior year of college, Plaintiff was recruited by TFA to become a teacher and join TFA's mission to "close the achievement gap" for students in high needs public schools across this country.  Following a rigorous vetting process, he was selected by TFA for elementary school teaching in the Mid-Atlantic Region (which included the cities of Wilmington and Philadelphia.) As earlier alleged, he self-identified his disabilities and associated impairments (early childhood through college) from inception of TFA's application, recruiting and selection process in 2009 and beyond.

61.        TFA's disabilities accommodations office formally confirmed that Plaintiff's disabilities status was processed with an approved disabilities accommodation (extended time) during the application/interview exercises and TFA's Summer Institute though TFA did not honor extended time from substantially the entire Institute training.

62.        Plaintiff had been professionally diagnosed with a speech fluency impairment (stammering), ADD, and LD (without provision of disabilities accommodations) which continue to limit, among other things, his speed of reading, sequencing and writing.  From on or about 4th grade elementary school, he was identified by the school district as eligible for a 504 Plan under the RA specifying extended time, short breaks to refocus, written directions for assignments and/or support services including a reading specialist.

63.        Plaintiff's speech impediment was obvious, but at no time did TFA express reservations before assigning him to teach at DCPA that his stammering was of any concern or any bar to becoming a successful TFA teacher.  Yet, he later became the target of harsh scrutiny during a single classroom observation in September, 2010 when it was falsely perceived that his

18

voice was a classroom management issue. Periodically, he would raise the volume or tone of his voice as a means of controlling his stammering or would repeat (if he stammered) to be sure the students understood him.

64.        Before Plaintiff began teaching at TFA's assigned partner school (DCPA), he had to complete a rigorous mandatory "bootcamp" training called "Summer Institute."

65.        The Summer Institute training turned out to be brutal for Plaintiff because of TFA's inflexible deadline expectations and demands for a teacher with disclosed ADD and LD impairments that had been pre-approved for extended time. Plaintiff was placed in very cramped, noisy lodging quarters making it especially difficult for someone with ADD and LD impairments to keep focused and churn out the expected workload.

66.        Plaintiff's training managers were in the nature of "drill sergeants" imposing exhaustive *timed* training tasks (with very short timelines for completion of complex reading, writing classroom plans, and training exercises for which Plaintiff, a novice teacher, with known disabilities was supposed to have the TFA pre-approved accommodation of "extended time."

67.        During the 5-1/2 consecutive weeks of Summer Institute, Plaintiff barely slept more than 2-3 hours a night. He also went without consumption of food and water that further impacted his time management, focus, concentration and resulted in mounting fatigue and it became a daunting challenge to meet without provision of his pre-approved extended time accommodation.

68.        Plaintiff successfully matriculated and satisfied Brandeis University's rigorous academic requirements but, at a minimum, had his pre-approved "extended time" disabilities accommodations in place. During Summer Institute, he endured severe mental anguish and

19

emotional distress to timely achieve the mandatory timelines demanded by TFA without consideration of his impairments to be provided his TFA pre-approved extended time.

69.     On several occasions until close of Summer Institute in late July 2010, he was verbally ridiculed, harassed and threatened by TFA's training managers. It was very intimidating and humiliating for him to beg for his TFA pre-approved extended time disability accommodation that was being not honored.

70.     He barely received any extended time and it was made subject to the arbitrary whim of these TFA managers who instead equated his disabilities and accommodation requests as an indicator that he was not fully committed to the TFA core mission. Later, during the school year, Program Director Lock was indifferent when Plaintiff reported Roberson's refusal to grant extended time to him and threatened him that he could lose his job if he did not comply with her demands that he stay at school – often past midnight and on several occasions he had to remain there all night with no break for sleep, nourishment, shower and change of clothing.  His TFA colleagues were horrified to hear of Roberson's increasingly hostile and discriminatory treatment.

71.     Because he was involuntarily assigned to defendant DCPA's charter school, he had only a very short break after Summer Institute ended to recuperate before Roberson began teacher orientation on August 8, 2010.  Other TFA teachers (with no known disabilities) had the advantage of being assigned by TFA to traditional public schools with later school start dates, with breaks during the school day for lesson planning periods, lunch breaks, shorter school hours, better mentoring opportunities and a shorter academic year.

72.     Before Summer Institute, in early June 2010, TFA held an interview day open to all incoming TFA 2010 Delaware Corps Member teachers in which several TFA partner schools

20

participated. He was eager to learn of these opportunities before TFA's mandatory "bootcamp" training was underway.

73.      Plaintiff was not told that if one of these TFA's partner schools picked him, TFA would force him to work at such school regardless of whether it was an appropriate teaching environment for a "novice" TFA teacher with disclosed ADD and LD impairments.

74.      After enduring an extensive interview with Roberson and self-identifying his impairments to invite her needed feedback about whether her charter school would be a good fit for him since it did not have the same infrastructure as a traditional public school. She assured Plaintiff that his disclosed impairments would not be a bar to teaching at DCPA. He observed Roberson making copious interview notes. Yet, she later falsely denied ever knowing he had disabilities or need for accommodations.

75.      TFA was indifferent to Plaintiff's impairments and barriers. TFA viewed Plaintiff's reports of Roberson's harsh reprisals (which forced him to remain at school overnight) as lack of his leadership. Roberson continued to berate and harass Plaintiff if he was running late with assignments that had arbitrary short turnarounds. Roberson continued to emasculate him and falsely scrutinize his performance. When he sought accommodations before attending (the 6+ hour marathon) "performance discussion," she falsely accused him of playing the "disability card."

76.      As earlier alleged, Roberson bullied and punished him when he asked for extra time to complete assignments and administrative tasks such as writing teacher commentary in student report cards that she assigned with short deadlines.

77.      Following Plaintiff's successful completion of his first year of teaching in June 2011, Roberson falsely denied having knowledge of his disabilities or nature of his impairments to

justify her indifference to his documented needs and failures to provide disabilities accommodations other than to force him to remain at school past midnight under grueling conditions and to force him to teach a 9 hour day without sleep or hygiene. Meanwhile, Roberson worked very closely with TFA's leadership in Delaware (and Philadelphia) who knew or had reason to know or should have known or at a minimum had general knowledge of his self-disclosed impairments and disabilities accommodation needs. Roberson's denial of knowledge was false because Plaintiff's stammering impairment was obvious.

78.     TFA's Manager of District Strategy, Alex Leader-Smith, also was indifferent to Plaintiff's disclosed impairments and accommodation needs for extended time and lesson planning breaks. Plaintiff requested assignment to a traditional public school and Leader-Smith insisted he had to teach at DCPA under a mandatory TFA two-year commitment. There was no further interactive process initiated by TFA to determine if an alternative accommodation(s) could be made to assign Plaintiff to a traditional public school where at a minimum there would be a disabilities accommodations policy and a description of essential functions.

79.     TFA directed Plaintiff to teach at DCPA and there was no further interactive process to consider whether DCPA's status as an understaffed charter school without teacher break periods was an appropriate teaching environment (compared to the alternative of providing him the accommodation of a structured public school environment offering daily lesson planning periods, mentoring, a lunch/rest break and a realm of teaching resources available to a traditional public schools).

80.     TFA knew or should have known that DCPA did not have a school handbook of policies or any written policy for its TFA 2010 Corp Member teachers to follow concerning provision of disabilities accommodations or formal policies concerning equal opportunity and prohibiting discrimination, harassment or retaliation in the workplace.

81.    There was not a DCPA manual containing written policies governing performance, benefits, illness, observed holidays, and covering other indicia and terms of employment. Roberson ran the school "ad hoc" which ultimately violated Plaintiff's constitutional, statutory and civil rights, and deprived him of an interactive process after he self-identified with disabilities at the extensive DCPA interview and began to teach there.

82.    During DCPA's teacher orientation in early August 2010, Plaintiff was not furnished an employee handbook or written employer policies. DCPA's one-page offer letter stated that he would receive a performance review *during* the academic year (which DCPA's Dean of Instruction administered and gave him the highest rating "Effective"). Roberson promised him her *constructive* feedback which was not furnished or mentoring support by her while school was in session. She preferred to harass and intimidate him instead.

83.    DCPA teachers worked a nine (9) hour day without daily lesson planning breaks and without allotted time being provided for reflection during the school day. Teachers were not given lunch breaks and had to eat while supervising their students in the classroom. Plaintiff was limited to very short restroom breaks.

84.    From August 2010 to January 2011, Plaintiff taught in a cramped portable classroom on the school's property while the school building underwent total renovation. In both the portables and later in the renovated school building, he was forced to stand most of the 9-hour school day. He was not afforded a teacher-sized desk and chair; rather, he was only provided a second grader-sized desk and chair to use.

85.    He served meals to his students including breakfast, snacks and lunch. He was in the classroom before the start time to greet students and give them a daily "do now" morning drill. Since teachers were not given planning time during the day (except in limited instances on Wednesdays), Plaintiff had to prepare either after 4:00 PM or rise by 5:00 AM or earlier the following morning.

86.    As a teacher with ADD, Plaintiff faced daily impact on life activities in order to be prepared to teach class. This manifested in a daily challenge to avoid distractions and maintain focus while managing instructional time, meals, student behaviors and other administrative tasks during a nine hour workday, followed by lesson planning for the next school day and additional after-hours teacher responsibilities for TFA.

87.    At all relevant times herein, Plaintiff was qualified to perform his assigned position and what he understood or figured out to be essential functions of a novice second grade teacher.

88.    Plaintiff attained successful individual student and classroom-wide achievement outcomes. Data records were readily accessible and made available to defendants DCPA and TFA throughout the academic year, but defendants chose to accord little weight to objective criteria of positive achievement outcomes despite their mutually claimed priority of closing the achievement gap.

89.    Roberson knew of Plaintiff's ADD (executive functioning and time management impairments), yet she failed to provide him with reasonable advance notice of upcoming deadlines to complete his individually tailored teacher feedback on over 60 student report cards. She knowingly imposed unreasonable turnaround times to justify forcing him to remain at school after a 9+ hour workday (often past midnight and overnight) under her discriminatory duress and her threatened consequences if he left the building to finish the report cards at home.

90.    Roberson's demoralizing treatment, emasculation and humiliation of Plaintiff were unbearable. He reported to TFA Program Director Morgan Lock mounting episodes of Roberson's barbaric treatment (when he needed extended time) such as keeping him in the building overnight to finish work, and each time Lock was indifferent and reiterated the need to prioritize TFA's mission to "close the achievement gap" first and foremost beyond his personal needs.

91.    Plaintiff first experienced Roberson's hostile attitude in September 2010 after she passed by his classroom during a lesson. She made deprecating and humiliating comments to Plaintiff about

his classroom management style insisting that he must "man up," be "more manly" in the classroom and use a "male voice."

92.     Defendants' false discriminatory perceptions, biased stereotyping and regard of Plaintiff as a male teacher lacking "manliness" contributed to his toxic work environment.

93.     Plaintiff had a female co-teacher in the classroom who was a TFA Corps Member teacher in her second year at DCPA with no known disabilities. Roberson did not address her in an unprofessional, disrespectful, hostile and humiliating manner. Plaintiff's performance and teaching style was made subject to Roberson's gender and racial based double standard. But Roberson's disrespectful and unprofessional treatment of Plaintiff set the tone for how others viewed him.

94.     Given Roberson's discriminatory biases, it is not surprising that Plaintiff was eventually replaced at the direction of TFA and DCPA by a *minority* Latino male TFA colleague with no known disabilities and with a *darker* complexion and *deeper* male voice than Plaintiff and who did not receive as high a score on his Summative Evaluation as did Plaintiff.

95.     Roberson failed to provide Plaintiff with a copy of her completed "Roberson's Rubric" in advance of the (second) "performance discussion" *as she did with the other teachers*. She knowingly imposed a biased disadvantage for Plaintiff to read it on the spot and write his self-evaluative responses under extreme time pressure to set him up to fail. Roberson was extremely impatient with him and resorted to intimidation and oppressive tactics during this 6 + hours meeting.  She was dismissive of the Summative Evaluation that her own subordinate administered. She was dismissive of the positive data demonstrating academic growth of the students. She was dismissive of the facts of Plaintiff's disabilities and accused him of playing "the disability card." She also failed to email him a final typed version so he could submit a rebuttal. He emailed her on July 18, 2011 to remind her about sending him a final copy so he could write his rebuttal in accordance with his statutory rights as a Delaware teacher, but she never answered him.  Since there was a time period within

25

which to submit a rebuttal to Roberson's Rubric ratings, and since Roberson failed to comply with her obligation to deliver a copy of a final version, Plaintiff's right to submit a rebuttal was denied.

96.      Later in August 2011, Plaintiff met with DCPA's then interim Executive Director, Kimberly Chambers ("Chambers"), to view his personnel records after the school board discharged Roberson. The file only contained Plaintiff's teaching contract with DCPA for the 2010-2011 school year, the DCPA employment application, the two "Formative Feedbacks" (state-required classroom observations conducted by Dean Bono), and the Summative Evaluation.   Both Plaintiff and Chambers observed that his personnel file contained no copies of Roberson's Rubric ratings from the "second performance discussion" (either a handwritten markup or final typed copy).  When Plaintiff inquired as to the whereabouts of Roberson's Rubric, Chambers replied that if it was not in the file, it was not a part of his record.  However, when Plaintiff brought charges against DCPA and TFA at the DDOL and EEOC in November 2011, DCPA produced a copy of Roberson's Rubric with her handwritten comments. This is a further example of the extent to which DCPA would try to retaliate against Plaintiff and discredit Plaintiff's claims.

97.      Contrary to TFA's public press release on or about June 15, 2011 that it was recruiting 30+ Corps Member teachers for Delaware's 2011-12 school year, TFA still refused to reassign Plaintiff (as it had done for his Latino colleague) to a new partner school.  To no avail, Plaintiff indicated he would gladly accept reassignment outside Wilmington (if there were no second year Corps Member Teacher vacancies).

98.      Moorman dismissed Plaintiff in all TFA capacities in his evening phone call on July 18, 2011 and said a formal letter of dismissal would be issued.  Moorman deprecated him for advocating (for his civil rights protections as a teacher with disabilities).  He echoed Roberson's accusations not to play the "disability card" and attacked Plaintiff saying he lacked "leadership" by playing "victim.

99.      When Plaintiff stated to Moorman that he planned to *informally appeal* the dismissal decision and oppose Moorman's and Roberson's discriminatory refusal to reinstate and reassign him

to one of TFA's partner schools offering the traditional structured environment, Moorman was defensive, deprecating and angry because Plaintiff conveyed his belief that Moorman's decision was not *fair* or *"final."* **Plaintiff's TFA second-year teaching RPP Commitment provided for informal and formal appeal avenues.**

100.    TFA remained indifferent to Plaintiff being a qualified 2010 Corps Member teacher (with the highest "Effective" performance rating from DCPA's Dean of Instruction, classroom achievement data and other indicia of demonstrable results with his students, and also refused to reconsider the impact of his impairments with or without accommodations afforded by TFA and its partner school DCPA.

101.    TFA's rubber-stamping of Roberson's discriminatory conduct and TFA's failure to continue or approve alternative accommodations previously approved by it during the hiring and Summer Institute stages and failure to have any interactive process of Plaintiff's recruitment, selection, hiring and dismissal.

102.    Moorman even refused to furnish contact information of his TFA supervisor (Jemina Bernard).  He insisted he would inform her about Plaintiff's request *for TFA's informal appeal process.* Yet, before Plaintiff had any opportunity to directly communicate his informal appeal, Bernard emailed him that she supported Moorman's dismissal decision. Bernard d*enied Plaintiff an opportunity to have an informal appeal dialogue* after she invited him to ask questions.  Bernard avoided direct contact and turned the matter over to TFA's General Counsel (Tracy-Elizabeth Clay).

103.    DCPA ignored ADA, ADAAA, and RA mandates regulating the recruiting, selection and hire of applicants, candidates and employees with disabilities. Once Plaintiff identified his disabilities at the interview stage, he expressed the need for extended time accommodations throughout his first year of teaching.

104.    Roberson's negative attitude for Plaintiff's documented disabilities and accommodation needs was consistent with her disdain for providing special education services for students with

disabilities at DCPA. Upon information and belief, DCPA was in substantial non-compliance with state and federal laws governing the provision of services to special needs students, including IEPs and Section 504 Plans. Upon information and belief, by the end of the June 2011 academic year, there were excessive hours owed to students in pullout and other remedial services that characterize compliance with laws governing special education.

105.      Plaintiff raised concerns with Roberson about the needs of some of *his students* whom, upon information and belief, were owed or eligible for special education services. However, Roberson reacted negatively each time the topic was broached by Plaintiff and refused to take any action. He was afraid of her open hostility and possible reprisals if he continued to press her about the foregoing. Prior to filing this complaint, he learned that Roberson had a long history of ignoring the school's obligations to provide student special education services and this became the subject of legal proceedings[1].

106.      The explanation offered for the nonrenewal of Plaintiff's employment was false, discriminatory and retaliatory. Because of his disabilities, he was treated differently and adversely in the terms, conditions and privileges of his employment with DCPA and TFA (and lost TFA Corps Member status as well) compared to teachers with no known disabilities. TFA and DCPA acted individually and in concert to jointly end his teaching employment and career. This is evidenced by a) Roberson concocted the second "performance discussion" (held <u>after</u> the end of the 2010-2011 school year, in violation of the terms in Plaintiff's teaching contract), using a rubric she designed but did not share with Plaintiff before the meeting (unlike other DCPA teachers), and used the rubric ratings to tarnish his receipt of the highest possible ratings on his Summative Evaluation filed with the state less than a month earlier. b) Roberson then used her rubric ratings as a pretext to not renew Plaintiff's contract for the 2011-2012 academic year, c) By not having Plaintiff's contract renewed at

---

[1] Plaintiff will provide the case citation to at least one case involving the serious deprivation of rights under IDEA and Rule 504 by Roberson for which DCPA was required to pay damages to the student involved.

DCPA, it gave Moorman a pretext to dismiss Plaintiff from TFA even though he had reinstated and reassigned a Latino Corps Member to DCPA despite his contract not being renewed at his original placement school.

107.    After the discriminatory and retaliatory dismissal by TFA, Plaintiff suffered many reprisals including the following examples: (a) TFA officials arranged for the immediate suspension of his Delaware alternative teaching licensure which is a matter of public record and very professionally disparaging; (b) Moorman falsely informed the interim DCPA Executive Director Kimberly Chambers in August 2011 while Plaintiff's dismissal appeal was pending (and after Roberson was terminated by the DCPA Board) that the TFA decision was "final" even though Moorman and other TFA officials were aware of his exercise of appeal rights under the TFA RPP Commitments; (c) Moorman's advice led the DCPA interim director to falsely conclude that Plaintiff could not be reinstated by TFA ever or could not be hired as a non-TFA teacher so DCPA hired someone else; (d) Plaintiff re-applied for other posted vacancies at DCPA before he knew that TFA had retaliated by causing the state DOE to suspend Plaintiff's alternative teaching license; (e) DCPA refused to consider hiring Plaintiff, even though at least one DCPA teacher (African American female) taught there and did not have the requisite licensing in place (upon information and belief, Roberson sought and secured a DOE waiver on her behalf); (f) DCPA would not procure a waiver for Plaintiff; and (g) pending resolution of his TFA dismissal appeal, DCPA later refused to hire him back stating he did not have a current DE-DOE teaching license.

108.    DCPA posted other vacancies in administrative roles or as a permanent substitute teacher capacity (during his TFA appeal), but no formal offer of new employment or any reinstatement was made to Plaintiff by DCPA or TFA.  As a result, Plaintiff lost his extremely valuable TFA 2010 Corps Member status (*including lifetime TFA Alumni benefits*).

109.    The defendants failed and/or refused to reconsider their respective actions and respond to Plaintiff's appeal letters describing the discrimination and retaliation grievances in detail including

29

his appeal of the prohibited conduct and decisions against him. DCPA's school board President Jones emailed to say they would investigate his allegations in his grievance letter, dated August 8, 2011, but failed to do so to his knowledge.

110.    Plaintiff alleges that all of the foregoing decisions, incidents, treatment, remarks, conduct and adverse employment actions constitute race, gender and disability bias, discrimination and retaliation against him in the terms, conditions and privileges of his former employment and teaching status with defendants.

111.    Further, Plaintiff alleges that the defendants' unlawful treatment and retaliatory conduct continued even after he was informed of DCPA's decision to not renew his contract and TFA's decision to dismiss him as a corps member. This includes TFA's refusal to this day to follow their own grievance process outlined in the TFA RPP "Commitments" because Plaintiff had filed charges against them with the DDOL and the EEOC.

112.    DCPA further retaliated against Plaintiff when they shared false information with a background check investigator who was conducting a background check for an entity who was conducting a background check in conjunction with an offer of employment. DCPA's false information that was shared included the claim that Plaintiff had been terminated, despite having successfully completed the terms of his contract. DCPA's retaliatory conduct was yet another attempt to tarnish Plaintiff's reputation. The remedies sought by Plaintiff include all damages resulting from Defendant DCPA's and TFA's discriminatory and retaliatory conduct, behavior, remarks, actions and disparagement against him under applicable federal and state laws as alleged herein.

113.    All of the acts and failures to act alleged herein were duly performed by and attributable to, and under the common control and direction of defendants TFA and DCPA, their officers, management, executive directors, supervisors, and each of said persons delegated by either of them (a) to perform the functions associated with making decisions (such TFA teacher candidate selection, hire, and dismissal processes), and (b) to direct Plaintiff's TFA 2010 Corps Member teacher

placement and TFA partner school assignment, (c) for the provision of reasonable job accommodations by TFA and/or DCPA, and (d) in the terms, conditions and privileges of his employment. Said persons delegated to act for TFA and/or DCPA were respectively acting as an alter ego of one or both defendants and vicariously, as a single integrated enterprise or alternatively joint enterprise, as agent, employee, or under the common direction and control of the others working for defendants or at the behest of defendants or carrying out the duties and responsibilities of defendants, except as otherwise alleged in this complaint. The alleged acts and failures to act were within the scope of such agency and/or employment. Each of said defendants and their foregoing agents, representatives, management, and operating personnel participated in, approved and/or ratified the other defendant's unlawful acts and omissions alleged in this complaint.

114.    Plaintiff performed his teaching responsibilities in a professional and diligent manner and had the requisite qualifications, skills, and knowledge deemed necessary to receive state teaching alternative licensure by the DE-DOE. At the time of Plaintiff's selection by TFA and DCPA, he was a qualified employee for the assigned teaching position, job duties and delegated areas of responsibility.

115.    As a result of defendants' unlawful acts, Plaintiff has been damaged and deprived of wages, benefits, other terms and conditions of his teaching employment and other entitlements which he would have received but for defendants' unlawful adverse employment actions against him which materially altered the terms, conditions and privileges of his TFA 2010 Corps Member good standing status, his teaching employment, and DE-DOE alternative teaching licensure. Plaintiff has suffered humiliation, degradation, mental anguish, emotional distress, pain and suffering, all to his continuing damage.

116.    Finally, defendants created and allowed to exist a workplace permitting retaliation for exercising his civil rights to be free of discriminatory conduct that was sufficiently severe so as to materially alter the terms, conditions and privileges of Plaintiff's TFA 2010 Corps Member teacher

employment. Plaintiff was tormented, extremely humiliated and embarrassed to be kept at DCPA against his free will past midnight and overnight because he was deprived of reasonable disabilities accommodations that were not unduly burdensome. The foregoing examples of retaliatory acts are not exhaustive, and demonstrate that a persisting employment practice and policy existed, and was not effectively or promptly remedied and defendants permitted the decision-makers (or those influencing decisions-makers) to retaliate against Plaintiff to his extreme detriment culminating in his retaliatory termination.

## FIRST CAUSE OF ACTION

### Disability Discrimination under the ADA, ADAAA and RA

117.    Plaintiff repeats and realleges paragraphs 1 through 116 of this complaint as if fully set forth herein.

118.    By the aforementioned actions, defendants TFA and DCPA, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of his employment, training, on the basis of his disabilities:

(a) Plaintiff is a qualified individual and was able to perform the essential functions as a novice second grade teacher with or without reasonable disabilities accommodations;

(b) He self-identified as a TFA 2010 Corp Member teacher with disabilities of ADA and LD and has an obvious speech impairment of stammering;

(c) He was not afforded the good faith interactive process concerning his impairments and suitable accommodations with one or both defendants TFA and/or DCPA under the ADA, ADAAA and RA.

(d) Upon information and belief, as respective recipients of government funding and/or participation in federally-funded government programs TFA and DCPA are further subject to adherence to anti-discrimination statutory prohibitions to protect qualified individuals with disabilities;

32

(e) TFA and DCPA have and had a duty to engage in the good faith interactive process with Plaintiff and such duty was triggered by their actual, constructive and general knowledge that he was a novice teacher with self-disclosed impairments;

(f) Defendants did not consider the feasibility of providing Plaintiff with accommodations or alternative accommodations while he taught at DCPA and Plaintiff was entitled to have the interactive process with the defendants; and

(g) Defendants failed to provide a list and description of the essential job functions of his teaching position.

119.     As a result of the discrimination engaged in by defendants, Plaintiff has suffered and will continue to suffer severe damage, including deprivation of income and benefits, termination of his 2010 Corps Member teaching status and employment, loss of opportunity for advancement in the educational field, emotional distress, pain and suffering, mental anguish, humiliation and damage to reputation with a permanent stain.

## SECOND CAUSE OF ACTION

### Retaliation under the ADA, ADAAA and RA

120.     Plaintiff repeats and realleges paragraphs 1 through 119 of this complaint as if fully set forth herein.

121.     Because of defendants' failure to have the interactive process before he began teaching at DCPA concerning his ADD and LD disabilities and his obvious speech impairment (stammering), he was made subject to severe false scrutiny and ridicule by Roberson and Moorman who collaborated to dismiss Plaintiff based on their discriminatory false negative perceptions about his teaching style in the classroom.

122.     Without being provided with reasonable disabilities accommodations when he began to teach and for mentoring and training as a notice teacher, this became a false predicate for targeted harassment and criticism keeping him at DCPA against his free will past 12 midnight and sometimes

33

all night and then forcing him to teach the next day *without sleep, nourishment, shower, or change of clothes, stand for nine hours without breaks* (such as for daily class planning periods and a meal break).

123.    TFA's refusal to have the interactive dialogue to explore in good faith whether it was feasible to insist that his assignment to teach at a charter school (DCPA) and/or refusal to consider *reassignment to a traditional public school setting* for his second year of teaching when Roberson did not renew him (which would have been a reasonable alternative accommodation rather than *rubber-stamping* DCPA's reprisals against him including *non-renewal* weeks after Plaintiff's successful completion of the 2010-11 academic year.

124.    TFA's discriminatory decision to dismiss him for DCPA's non-renewal (when facts were made known by Plaintiff beforehand and following his request for an interactive process (on July 12, 2011) with Roberson for the ensuing school year, TFA acted in concert with DCPA to dismiss Plaintiff as the ultimate reprisal for his engagement in protected conduct (including alternative accommodations to be reassigned to a traditional public school) and to oppose the defendants' violation of his rights under the ADA, ADAAA, RA, and the state's DE-DEA and DE-PDEPA.

125.    As a result of the retaliation engaged in by defendants separately and together operating including as a single enterprise employer and/or alternatively as a joint enterprise, and/or placement agency or training program and by reason of each defendant's sharing of direction and control over Plaintiff's employment, they have caused Plaintiff to suffer severe pecuniary and compensatory damages, including deprivation of income and benefits, loss of employment, loss of opportunity for career advancement as a teacher, suffered TFA suspension of his Delaware DOE state alternative licensure, loss of his opportunity to pursue and obtain his graduate degrees in education, severe emotional distress, pain and suffering, mental anguish, humiliation and damage to his reputation resulting in a permanent stain on his professional record.

34

### THIRD CAUSE OF ACTION

**Gender/Sex Discrimination and Stereotyping under Title VII and CRA 1991**

126.    Plaintiff repeats and realleges paragraphs 1 through 126 of this complaint as if fully set forth herein.

127.    By the aforementioned actions, defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of his 2010 Corps Member teacher employment, on the basis of his being male because he was falsely judged to not have a "male" voice in the classroom, and then falsely perceived to be *not manly* enough, making biased and discriminatory remarks and engaging in stereotyping on the basis of male gender and sex in violation of TITLE VII, and the DE-DEA.

128.    As a result of this prohibited discrimination engaged in by defendants, Plaintiff has suffered and will continue to suffer severe damage, including deprivation of income and benefits, loss of his valuable 2010 Corps Member teacher status and employment, loss of opportunity for advancement and graduate education, severe emotional distress, pain and suffering, mental anguish, humiliation and damage to his education career and suffering a permanent stain on his reputation.

### FOURTH CAUSE OF ACTION

**Retaliation under Title VII and CRA 1991 for
Gender/Sex Discrimination and Stereotyping**

129.    Plaintiff repeats and realleges paragraphs 1 through 128 of this complaint as if fully set forth herein.

130.    By the aforementioned actions, defendants, separately and together, have subjected to retaliation and abuse with malice environment the basis of his male sex and gender stereotyping and race, in violation of TITLE VII and the CRA 1991.

As a result of the defendants' outrageous reprisals and retaliatory treatment, and complicit conduct to end his status and good standing at TFA and to bring about his dismissal due to DCPA's non-renewal

and to deprive him of and ignore his rights under the TFA informal appeal or any grievance appeal process under either of TFA's and DCPA's grievance process to reconsider the Plaintiff's nonrenewal and/or dismissal, he has suffered and will continue to suffer severe damage, including deprivation of income and benefits, loss of his alternative state teaching licensure status, loss of equal opportunity to complete his second year of TFA teaching under his signed TFA RPP Commitment, severe emotional distress, pain and suffering, mental anguish, humiliation and damage to his reputation, life pursuits and career advancement in education.

### FIFTH CAUSE OF ACTION

### Hostile Work Environment On the Basis of Disability, Male Gender/Sex, Race and Stereotyping

131. Plaintiff repeats and realleges paragraphs 1 through 130 of the complaint as if fully set forth herein.

132. By the aforementioned actions, defendants, separately and together, have subjected to a hostile and abusive work environment, on the basis of his disability, male sex gender stereotyping and race, in violation of ADA, ADAAA, RA,TITLE VII, CRA 1991, DE-DEA and DE-DPEP

133. As a result of the defendants' toxic treatment, outrageous reprisals, abuse, harassment and professional denigration leaving a permanent stain on his reputation and their complicit adverse employment actions to end his status and good standing at TFA, in bringing about his dismissal on pretextual grounds, Plaintiff has suffered and will continue to suffer severe damage, including deprivation of income and benefits, loss of his alternative state teaching licensure status, loss of the equal opportunity to complete his second year of TFA teaching under his signed TFA RPP Commitment, severe emotional distress, pain and suffering, mental anguish, humiliation and damage to his reputation, all affecting the loss of life pursuits and quality of his life.

## SIXTH CAUSE OF ACTION

### Discrimination under the DE-PDEPA on the basis of Disability

134.    Plaintiff repeats and realleges paragraphs 1 through 133 of the complaint as if fully set forth herein.

135.    TFA and DCPA are employers under the DE-PDEPA, and further TFA is a placement agency and training organization, each subject to the provisions of the DE-DPED and prohibited from engaging in discrimination against Plaintiff on the basis of disability suffered by Plaintiff while teaching as a 2010 TFA Corp Member teacher and assigned to perform teaching services at DCPA.

136.    By the aforementioned actions, defendants, separately and together, have contributed to Plaintiff's discriminatory and hostile environment including heightened scrutiny, biased ridicule, harassment and intimidation at all relevant times complained of herein and failing to provide a list and description of the essential functions of his teaching position and engaging in the interactive process with regarding to disabilities accommodations.

137.    As a result of defendants' discriminatory employment practices, Plaintiff has suffered and continues to suffer severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## SEVENTH CAUSE OF ACTION

### Retaliation on the basis of Disability Race, and Gender/Sex under the DE-DEA and DE-DPEP

138.    Plaintiff repeats and realleges paragraphs 1 through 137 of the complaint as if fully set forth herein.

139.    Defendants, separately and together, have discriminated against in retaliation for, and on account of, his opposing the violations of and asserting his rights under the ant-discrimination

37

laws with respect to the terms, conditions and privileges of his employment in violation of the DE-DEA and DE-PDEPA.

140.    As a result of defendants' retaliation against him, Plaintiff has suffered and continues to suffer severe damage, including deprivation of income and benefits, loss of good standing as a TFA 2010 Corps Member teacher with loss of his valuable employment, loss of opportunity for career advancement in the education field, severe emotional distress, pain and suffering, mental anguish, humiliation, permanent stain and damage to his reputation and malicious deprivation of his rights to equal employment opportunity all in violation of the DE-DEA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in his favor and that the Court order and award him the following relief against defendants, TFA and DCPA:

A.    That the defendants be found to have violated the ADA, ADAAA, RA, Title VII, CRA 1991, DE-DEA and DE-DPEP and to be enjoined from engaging in unlawful discriminatory employment practices against teachers with disabilities and from depriving them of accommodations such as extended time, rest breaks, meal breaks and daily classroom planning periods during the school day;

B.    That the defendants be ordered to engage in compliant employment practices under the ADA, ADAAA, RA, Title VII, CRA 1991, DE-DEA and DE-DPEP;

C.    Damages of not less than two (2) years' back pay with interest based on Plaintiff's compensation and the lost value of benefits that he would have received had he not been discriminated against by defendants;

D.    Damages of not less than 10 years' front pay based on Plaintiff's compensation that he would have received had he not been discriminated against by defendants;

E.    Compensatory damages for Plaintiff's severe mental anguish, pain and suffering, extreme emotional distress, humiliation, disparagement and reputational injuries;

38

F.     Punitive damages in the maximum dollar amount available under law for defendants' individual and concerted outrageous, willful and/or malicious acts, conduct and reprisals     to intentionally deprive Plaintiff of enjoyment of the terms, conditions and privileges of his employment and his life and liberty;

G.     Damages for Plaintiff's other pecuniary losses for educational and career advancement;

H.     Damages as shall be determined just and proper to make Plaintiff whole on 12 months' rent for his Wilmington apartment, utilities, furnishings and moving costs that he was     forced to incur between July 1, 2011 through June 30, 2012;

I.     Ordering defendant TFA to reinstate Plaintiff to TFA 2010 Corps Member status in good standing and in all capacities for the purpose of restoring TFA Corps Member Alumni status together with entitlement to all TFA lifetime alumni benefits;

J.     Costs, disbursements and expenses including reasonable attorneys' fees, if any;

K.     Pre-Judgment and Post-Judgment interest; and

L.     Such other and further necessary and appropriate relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in this proceeding.

Dated:  New Canaan, Connecticut
        July 31, 2015

                                        Respectfully submitted,

                        By:  _____
                             Andrew Brooks, *Pro Se*
                             43 Park Place
                             New Canaan, CT 06840
                             (203) 972-0371
                             (203) 972-9498 fax
                             andbro2000@gmail.com

39